UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------------X
                                 :

RORY THOMPSON,                         :

                      Plaintiff,   :           12 Civ. 8034 (PAE)

                              :         OPINION & ORDER

         -v-                  :

                              :

NEW YORK CITY, ROBERT DOAR, Individually and as :
Commissioner of the NEW YORK CITY HUMAN
RESOURCES ADMINISTRATION, and STEPHANIE  :
GRANT, Individually and as the EEO Officer/Director of :
the NEW YORK CITY HUMAN RESOURCES     :
ADMINISTRATION,

                              :

                    Defendants.  :

                              :
------------------------------------------------------------------------X

PAUL A. ENGELMAYER, District Judge:

     Plaintiff Rory Thompson brings this suit against New York City; Robert Doar,

individually and as commissioner of the New York City Human Resources Administration

("HRA");  and Stephanie Grant, individually and as the Equal Employment Opportunity

("EEO") Officer/Director of HRA (collectively, defendants).  He alleges that defendants

discriminated against him based on his race and gender and subjected him to a hostile work

environment, in violation of the Equal Protection Clause and the Due Process Clause of the

Fourteenth Amendment, as secured by 42 U.S.C. § 1983; 42 U.S.C. § 1981; and the New York

City Human Rights Law, N.Y. Admin. Code §§ 8-107 *et seq.*  Thompson's suit arises out of the

defendants' handling of an administrative complaint lodged against him in 2008, which alleged

that he had sexually harassed a female employee under his supervision.  The gravamen of

Thompson's lawsuit is that defendants have responded more punitively to such complaints when

they have been lodged against African-American men such as himself.

Defendants now move to dismiss Thompson's Second Amended Complaint, under Federal Rule of Civil Procedure 12(b)(6), for failure to state a claim.  For the reasons that follow, the motion to dismiss is granted.

## I.    Background[1]

### A.   The Parties

Thompson has worked at HRA, a New York City agency, since 1987, when he joined as a caseworker.  SAC ¶¶ 9, 21.  Currently, Thompson serves as Director of Employment Programs at the Office of Procedures at HRA's Family Independence Administration.  *Id.* ¶ 22.  In this position, Thompson supervises several employees in drafting employment procedures.  *Id.* ¶ 23.

Robert Doar is Commissioner of HRA.  *Id.* ¶ 11.  Stephanie Grant is the EEO Officer/Director of HRA.  *Id.* ¶ 13.

### B.   The 2008 Sexual Harassment Complaint Against Thompson

On or about October 27, 2008, Gloria Alexander ("Alexander"), a female employee who Thompson had supervised between July 2006 and February 2008, filed a complaint against Thompson alleging that, during an unspecified period of time, Thompson, her supervisor, had

---

[1] The facts related herein are drawn from the Second Amended Complaint ("SAC").  Dkt. 30. For the purpose of deciding the motion to dismiss, the Court accepts as true the facts alleged in the SAC and draws all reasonable inferences in Thompson's favor.  *See, e.g.*, *Galiano v. Fidelity Nat'l Title Ins. Co.*, 684 F.3d 309, 311 (2d Cir. 2012); *Holmes v. Grubman*, 568 F.3d 329, 335 (2d Cir. 2009).  The Court's account of the underlying facts is also drawn from two exhibits to the Declaration of Benjamin Stockman ("Stockman Decl."), Dkt. 35, Exhibit B ("Arbitration Award") and Exhibit C ("EEO Compl."); and the first of two letters ("Feb. 4, 2009 Letter") in Exhibit D attached to the Second Declaration of Benjamin Stockman ("Stockman Sec. Decl."), Dkt. 51.  The Court may consider these exhibits, which were submitted by defendants, because the SAC refers to them.  *See Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002).

Defendants also submitted a second letter, dated February 3, 2009, as page two of Exhibit D in Stockman Sec. Decl.  Thompson moved to strike that letter because, he stated, the SAC did not refer to it, but rather to another letter of the same date.  Dkt. 43.  In defendants' letter of reply, they stated that they do not object to the Court's disregarding the February 3, 2009 letter.  Dkt. 45.  The Court therefore will not consider that letter.

sexually harassed her.  SAC ¶ 36; EEO Compl. at 1; Arbitration Award at 3.  In the complaint, Alexander set out chronologically her allegations of what she termed Thompson's "progressive … sexual abuse" of her.  EEO Compl. at 1.

Specifically, Alexander alleged, when Thompson joined the Office of Procedures, Alexander helped him get acclimated.  *Id.*  Alexander alleged that once, after she assisted him, Thompson "all of a sudden grabbed my hand and kissed it while thanking me for whatever it was I'd done."  *Id.*  She also witnessed him, while on his knees, kiss another employee's hand.  *Id.*  Thompson would compliment her appearance and her perfume with comments such as "you smell nice, what are you wearing?"  *Id.*  He complimented her both when they were alone and in public.  *Id.*

Initially, Alexander alleged, when she and Thompson discussed her assignments, they would sit side-by-side, perhaps because of the small size of Thompson's cubicle.  *Id.*  During these interactions, Thompson "would rest his hand on my thigh or cover my hand with his while talking to me."  *Id.*  Unsure what to do, Alexander tried to avoid sitting next to him.  *Id.*  Thompson continued to compliment her smell and appearance and to ask her for help on minor tasks.  *Id.* at 2.  In response, Alexander "stopped wearing perfume and attempted not to care about how I dressed.  Anything to get his attention away from me."  *Id*.

Thompson would also make sexually explicit comments in the office.  *Id.*  Other people laughed, and Alexander felt like "the spoil sport."  *Id.*

Alexander further alleged that she once observed Thompson looking at another female employee "running his eyes up and down her body."  *Id.* at 3.  Another time, while Thompson was joking with another female employee, Kweli Campbell, he grabbed Campbell around the neck and shoulders, turned her around and "spanked her on the butt."  *Id.*  In another incident,

while Alexander was leaning over Thompson to help him with a computer problem, Thompson said to her, "let me zip up my pants before somebody gets me in trouble." *Id.*

Eventually, Alexander alleged, she confronted Thompson about his inappropriate behavior and they stopped talking. *Id.* at 4.  In March 2008, supervision of Alexander was transferred from Thompson, but when her new supervisor was out, Alexander still had to work with Thompson.  Arbitration Award at 4.  During one of these periods, Thompson commented on the length of time since they had worked together, saying it had been a long time "you know since you were under me, oh no not under me, that's not the word, I was over you, oh not that either you know what I mean."  EEO Compl. at 4.  Thompson laughed at his own remarks.  *Id.*

### C.  HRA's Initial Findings

On or about October 28, 2008, Grant and her staff began an investigation in response to Alexander's complaint.  SAC ¶ 36.  On February 4, 2009, Grant issued Thompson an administrative warning.  *See* Feb. 4, 2009 Letter.  Grant's letter stated that HRA, through EEO counselor Miguel Perez, had "conducted a complete and thorough fact-finding investigation" of the allegations in Alexander's complaint.  *Id.*  The letter added that HRA "was able to substantiate allegations that [Thompson] conducted [himself] in an inappropriate manner which may have created a hostile work environment in the workplace."  *Id.*  The letter further stated that it would serve as an administrative warning and the findings would be forwarded to the Office of Legal Affairs "for review."  *Id.*

Upon receiving the letter, Thompson protested that the investigation and resulting findings were filled with "deficiencies and irregularities" and violated office procedures.  SAC ¶ 41.

4

### D.  HRA's Charges against Thompson

On Saturday, October 3, 2009, Thompson discovered administrative charging documents from HRA, signed by Doar, posted on the door of his home. *Id.* ¶¶ 64, 66.  Thompson claims that this "nail-and-mail" practice deviated from HRA's policy of delivering such charges to an employee at work where the employee, like Thompson, was not currently suspended. *Id.* ¶ 69.

HRA's charging documents, based on the investigation, recited two counts of misconduct. *Id.* ¶ 73.  The first was that Thompson had acted inappropriately with Alexander and Campbell.  *See* Arbitration Award at 3 (reprinting the charges).  It was based on Alexander's allegations in her 2008 EEO complaint as to Thompson's treatment of her, *see supra* pp. 3–4, and on her accusation that Thompson had attempted to "spank" Campbell's "posterior in front of other coworkers in a sexually provocative manner." *Id.* at 4.  This conduct, HRA claimed, constituted second-degree harassment in violation of N.Y.P.L. § 240.26, and violated five provisions of HRA's code of conduct: (1) Section III-34, which prohibits sexual harassment and offensive, obscene or sexual language or gestures; (2) Section III-33, which prohibits obscene, abusive or inappropriate language; (3) Section II-B, which requires employees to be courteous and considerate with fellow employees; (4) Section III-36, which prohibits conduct detrimental to the agency; and (5) Section III-1, which requires employees to conduct themselves in a manner which will reflect favorably upon them, HRA, and the city, and not in a manner prejudicial to good order and discipline.  *See* Arbitration Award at 4–5.

HRA's second count charged Thompson with inappropriate behavior toward a third female employee, Carly Sheck, whom Thompson supervised between February 2008 and June 2009. *Id.* at 5.  HRA alleged that on several occasions when Sheck had disagreed with Thompson over work matters, he had told her, "don't have an estrogen fit," "you don't have a

baby," "I don't want your lip," "watch your mouth," "I'm your supervisor," and "don't give me lip, lady—I'm your supervisor." *Id.* HRA charged that this conduct violated four provisions of the HR code of conduct: Section II-B, Section III-33, Section III-36, and Section III-1. *Id.* at 5–6. Unlike the first count, the second count did not charge Thompson with criminal harassment. *See id.* at 5–6.

### E. Thompson's Suspension and Successful Grievance Claim

On October 23, 2009, Thompson attended an "informal conference" with defendants. SAC ¶ 79; Arbitration Award at 3. The "Informal Conference Holder" then determined that the charges had been established and recommended that Thompson be terminated. Arbitration Award at 3. Thompson filed an administrative appeal. *Id.* On December 16, 2009, a "Step II hearing" was held. *Id.* On March 2, 2010, a Step II decision was issued, reducing the recommended penalty from termination to a 60-day suspension. *Id.* Thompson served his suspension, without pay and benefits, between March 5, 2010 and May 4, 2010. *Id.* SAC ¶ 83. After Thompson completed the suspension, his union, the Organization of Staff Analysts, challenged his suspension in arbitration. *See* Arbitration Award at 3.

Arbitration hearings were held on September 1, 2010, May 4, 2011, and July 11, 2011. *Id.* at 2. The parties agreed to submit post-hearing briefs; only the Union ultimately submitted one. *Id.* On February 24, 2012, the arbitrator held that Thompson had been wrongfully suspended and directed HRA to reimburse him for lost wages and benefits. *Id.* at 14. The arbitrator found that Thompson's conduct was "innocently intended," that employees "regularly participated in the jovial and lighthearted interactions that occurred," that "nothing that occurred was at the time perceived to be sexual harassment," that even the EEO Deputy Director "found the allegations to be inconsequential and insignificant," and that the penalty did not fit the crime.

*Id.* at 12–13.  Ultimately, the arbitrator concluded, Thompson's actions, "viewed in a light most favorable to the City," were merely "poor judgment and teenage-like behavior," but "did not create a hostile or offensive work environment."  *Id.* at 13.  The arbitrator therefore ordered the penalty reduced back to the initial administrative warning and ordered the City to make Thompson whole for lost pay and benefits.  *Id.*

### F.  The SAC's Allegations of Racial and Gender Discrimination

The SAC alleges that, both in investigating and adjudicating the sexual harassment complaint against Thompson, the defendants treated him more harshly because he is an African-American man.  SAC ¶¶ 103–05.  More broadly, it alleges, defendants have a custom, policy or practice of treating male African-American employees who are accused of sexual harassment more harshly than employees accused of sexual harassment who are not African American or male.  SAC ¶¶ 29–33.  To illustrate this alleged discrimination, the SAC identifies four employee "comparators" accused of sexual harassment and/or inappropriate conduct whom, it alleges, were treated more favorably than Thompson: two men who are not African-American, Simeon Sentino and Saul Neinstein; and two women, Theodora Berksteiner and Blondia Reynolds.  *Id.* ¶¶ 51–53, 56–58, 75, 78.  The SAC also alleges that three African-American men, Curtis Odom, Babatunde Oke, and Wayne Allen, were poorly treated in ways similar to Thompson.  *Id.* ¶¶ 46, 54, 58, 60.  Finally, the SAC alleges miscellaneous misconduct by defendants and persons they supervised.

More concretely, the SAC alleges the following seven acts of disproportionately harsh treatment of Thompson.

1.  Grant's EEO staff allegedly did not inform Thompson during the investigation that the complaint could lead to disciplinary action.  One EEO staff member, Miguel Perez, allegedly told Thompson that the complaint would *not* lead to disciplinary action.  *Id.* ¶ 37.

2. Grant's February 4, 2009 letter to Thompson allegedly gave insufficient notice:  It did not accuse him of sexual harassment, but stated only that "[you] conducted yourself in an inappropriate manner which may have created a hostile work environment"; it did not accuse him of misconduct with any employee other than Alexander; and it did not reveal that Grant had forwarded the matter to HRA's Office of Legal Affairs for "correction action."  *Id.* ¶ 39.

3. Alexander's complaint, the basis for the action against him, was allegedly an inadequate basis on which to bring charges against him.  It "provided a rambling account of alleged incidents, unrelated to any conduct rising to the level of sexual harassment or inappropriate conduct," including homophobic statements, and was time-barred.  *Id.* ¶¶ 42–45. Further, although HRA requires that sexual harassment claims be filed within a year of the incidents giving rise to the complaint, *id.* ¶ 44, Alexander's complaint allegedly recited incidents more than two years old.[2]  *Id.* ¶ 45.  Alexander's complaint also did not identify specific dates or months as to the incidents it alleged.  *Id.*  Defendants allegedly also pursued time-barred complaints by women against other African American men (Oke and Allen), *id.* ¶ 46, but when two women (Berksteiner and Reynolds) were accused of sexual harassment, defendants allegedly limited their investigation to a defined period (two months for Berksteiner and one for Reynolds) and gave Berksteiner notice of the dates on which the complained-of events occurred.  *Id.* ¶¶ 51– 53.

4. Without giving Thompson notice, defendants allegedly rescinded the administrative warning and sought to terminate him.  *Id.* ¶ 54.  Doar allegedly "took similar action against other male African American employees, including Oke."  *Id.*

---

[2] It is not clear the SAC contends that *all* of the incidents occurred more than two years before the filing of the complaint, or if only some did.

5.   The punishment that the defendants initially sought to impose, termination, was allegedly more severe than those imposed on employees who were not African-American men. *Id.* ¶ 55.  Thompson had worked at HRA for more than 20 years and had not received prior disciplinary complaints or warnings.  *Id.* ¶¶ 26, 55.  Unlike in his case, defendants allegedly did not seek to terminate similarly situated employees males who were not African-American (Sentino and Neinstein), *id.* ¶¶ 55–58, or a similarly situated woman (Reynolds), *id.* ¶ 51. Sentino, in fact, had been the subject of two sexual harassment or inappropriate conduct complaints, but defendants neither sought to terminate him nor took disciplinary action against him based on the first complaint.  *Id.* ¶ 57.  Similarly, defendants allegedly did not pursue disciplinary charges against Reynolds, even though they concluded she had engaged in either sexual harassment or inappropriate conduct.  *Id.* ¶ 59.  Instead, she was allowed to leave HRA, without a disciplinary record, for another city agency.  *Id.*  By contrast, Thompson alleges, defendants sought to terminate three African-American male employees, Allen, Odom and Oke, for sexual harassment.  *Id.* ¶¶ 54, 58.  Allen, in fact, was terminated even though the EEO staff concluded that it could not substantiate the charge of sexual harassment.  *Id.* ¶ 60.

6.   HRA's decision to post the charging documents to the door of Thompson's home, where his neighbors, friends, and family could see them, was humiliating and contrary to standard practice.  *Id.* ¶¶ 64–70.  This "nail and mail" method was not allegedly used in connection with charges against persons other than non-African American males (*e.g.*, Reynolds, Neinstein, Sentino, and Berksteiner).  *Id.* ¶ 78.

7.  Defendants charged Thompson with criminal harassment, despite knowing that he was not guilty of that charge, to mask their violation of the 18-month time limit for filing disciplinary

charges.  *Id.* ¶ 76.  Employees who were not African American males (including Reynolds,

Neinstein, Sentino, and Bernstein) were not charged with criminal conduct.  *Id.* ¶ 75.

### G.  Procedural History

On September 28, 2012, Thompson commenced this action in New York State Supreme

Court.  On November 5, 2012, defendants removed to federal court.  Dkt. 1.  On January 15,

2013, Thompson filed the original Complaint, Dkt. 7, and on January 18, 2013, an Amended

Complaint.  Dkt. 8.  On February 27, 2013, defendants filed an answer to the Amended

Complaint.  Dkt. 15.  On July 8, 2013, defendants filed a motion for judgment on the pleadings.

Dkt. 25.

On July 11, 2013, the Court held a pretrial conference.  Dkt. 29.  At that conference, the

Court granted Thompson leave to amend his complaint in response to defendants' motion for

judgment on the pleadings.  The Court also stayed discovery, save for two exceptions: as to (1)

the last known addresses for Donald Lemmons and Miguel Perez; and (2) the procedure manual

that the City uses in handling EEO complaints.

On July 25, 2013, Thompson filed the SAC.  It contained six counts of racial and gender

discrimination and of a hostile work environment.  Dkt. 30.  Specifically, Thompson alleged that:

(1) Doar and Grant treated him more harshly in their investigation and pursuit of Alexander's

complaint because of his race and gender, in violation of the Equal Protection Clause and Due

Process Clause of the Fourteenth Amendment; (2) in so doing, Doar, Grant, and the City

discriminated against him pursuant to a larger custom, policy, or practice of racial and gender

discrimination, in violation of 42 U.S.C. § 1983; (3) Doar and Grant, in their individual

capacities, impaired Thompson's right to make and enforce contracts free from racial

discrimination under 42 U.S.C. § 1981; (4) Doar, Grant, and the City subjected Thompson to

disparate treatment because of his race and gender, in violation of the Equal Protection Clause and the Due Process Clause; (5) the City impaired Thompson's right to make and enforce contracts free from racial discrimination under 42 U.S.C. § 1981; and (6) Doar, Grant, and the City discriminated against Thompson based on his race and gender in violation of the New York City Human Rights Law, NYC Admin. Code § 8-107 *et seq* (NYCHRL).  To the extent that Thompson claims unconstitutional conduct, he seeks relief under 42 U.S.C. § 1983.

On August 15, 2013, defendants filed a motion to dismiss, Dkt. 33, a supporting memorandum of law ("HRA Br."), Dkt. 34, and the accompanying Declaration of Benjamin Stockman ("Stockman Decl."), Dkt. 35.  Defendants argued that (1) the SAC fails to state any claim for which relief could be granted, (2) the SAC fails to allege the personal involvement of Doar and Grant, and (3) the § 1983 and NYCHRL claims are time-barred.

On October 8, 2013, Thompson filed an opposing brief ("Thompson Br."), Dkt. 38, and the accompanying Declaration of Sandra D. Parker ("Parker Decl."), Dkt. 39.  On October 15, 2013, the defendants filed a reply ("HRA Reply Br."), Dkt. 40, and a Second Declaration of Benjamin Stockman in support of the reply ("Stockman Sec. Decl."), Dkt. 41.  On November 12, 2013, the Court heard argument.

## II.   Applicable Legal Standard

To survive a motion to dismiss under Rule 12(b)(6), a complaint must allege facts that, accepted as true, "state a claim to relief that is plausible on its face."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Iqbal*, 556 U.S. at 678.  A complaint is not required to provide "detailed factual allegations," but must assert "more

than labels and conclusions" and more than "a formulaic recitation of the elements of a cause of action." *Twombly*, 550 U.S at 555. Therefore, "[w]here a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief." *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 557) (internal quotation marks omitted).

Although "[t]he pleading standard for employment discrimination complaints is somewhat of an open question," in the Second Circuit, these claims "must meet the standard of pleading set forth in *Twombly* and *Iqbal*, even if pleading a prima facie case is not required." *Hedges v. Town of Madison*, 456 F. App'x 22, 23 (2d Cir. 2012) (summary order). "[T]he elements [of a prima facie case] provide an outline of what is necessary to render her claims for relief plausible." *Sommersett v. City of N.Y.*, No. 09 Civ. 5916 (LTS) (KNF), 2011 WL 2565301, at *5 (S.D.N.Y. June 28, 2011); *see also Trachtenberg v. Dep't of Educ. of N.Y.*, 937 F. Supp. 2d 460, 466 (S.D.N.Y. 2013).

## III.   Discussion

### A.   Claims of Racial and Gender Discrimination Under §§ 1983 and 1981

"[Section] 1983 and the Equal Protection Clause protect public employees from various forms of discrimination, including hostile work environment and disparate treatment. . . .  Once action under color of state law is established, the analysis for such claims is similar to that used for employment discrimination claims brought under Title VII, the difference being that a § 1983 claim, unlike a Title VII claim, can be brought against individuals." *Demoret v. Zegarelli*, 451 F.3d 140, 149 (2d Cir. 2006). A *prima facie* case of employment discrimination under § 1983 requires a plaintiff to demonstrate that: "(1) he belonged to a protected class; (2) he was qualified for the position; (3) he suffered an adverse employment action; and (4) the adverse employment

action occurred under circumstances giving rise to an inference of discriminatory intent." *Allen v. Murray-Lazarus*, 463 F. App'x 14, 16 (2d Cir. 2012) (quoting *Terry v. Ashcroft*, 336 F.3d 128, 138 (2d Cir. 2003)).

"Section 1981 provides, in pertinent part, that '[a]ll persons within the jurisdiction of the United States shall have the same right ... to make and enforce contracts ... as is enjoyed by white citizens.' 42 U.S.C. § 1981(a).  Section 1981 thus outlaws discrimination with respect to the enjoyment of benefits, privileges, terms, and conditions of a contractual relationship, such as employment." *Patterson v. Cnty. of Oneida, N.Y.*, 375 F.3d 206, 224 (2d Cir. 2004).  "Most of the core substantive standards that apply to claims of discriminatory conduct in violation of Title VII are also applicable to claims of discrimination in employment in violation of § 1981." *Id.* at 225.  "To establish a claim under § 1981, a plaintiff must allege facts in support of the following elements: (1) the plaintiff is a member of a racial minority; (2) an intent to discriminate on the basis of race by the defendant; and (3) the discrimination concerned one or more of the activities enumerated in the statute (i.e., make and enforce contracts, sue and be sued, give evidence, etc.)." *Mian v. Donaldson, Lufkin & Jenrette Sec. Corp.*, 7 F.3d 1085, 1087 (2d Cir. 1993).

Defendants do not dispute that the first three elements of a *prima facie* case under § 1983 have been properly pled: that Thompson is a member of a protected group, was qualified for his position, and suffered an adverse employment action.  Similarly, defendants do not dispute that Thompson has adequately alleged two of the three elements under § 1981: that he is a member of a racial minority and that the alleged discrimination occurred in a workplace setting in which he sought to make or enforce contracts.

All of Thompson's racial and gender discrimination claims therefore turn on whether he has alleged facts that allow the Court to plausibly infer that defendants discriminated against

him, on the basis of his race and/or gender, in handling the sexual harassment complaint against him.  *See Sanders v. Genadier Realty*, 367 Fed. App'x 173, 175 (2d Cir. 2010) (affirming dismissal "because plaintiffs do not allege any facts supporting an inference of racial animus"); *see also Bhanusali v. Orange Reg'l Med. Ctr.*, 10 Civ. 6694 (CS), 2013 WL 4828657, at *7 (S.D.N.Y. Aug. 12, 2013) (granting motion to dismiss when a plaintiff alleged "no facts rendering plausible the conclusion that he was treated unfairly *because* of his age, race, or national origin").

There are a number of means by which the requisite inference of discrimination can be properly alleged, or, at a later stage, established.  *See Chambers v. TRM Copy Centers Corp.*, 43 F.3d 29, 37 (2d Cir. 1994) (noting, in context of claim of discriminatory discharge, that "circumstances contributing to a permissible inference of discriminatory intent may include the employer's continuing, after discharging the plaintiff, to seek applicants from persons of the plaintiff's qualifications to fill that position . . . or the employer's criticism of the plaintiff's performance in ethnically degrading terms . . . or its invidious comments about others in the employee's protected group . . . or the sequence of events leading to the plaintiff's discharge . . . or the timing of the discharge").  Here, given the context of Thompson's claim, *i.e.*, discriminatory responses to claims of sexual harassment, the SAC relies on a different, but also recognized, method to raise an inference of discrimination: disparate treatment.  Specifically, the SAC seeks to show that defendants treated Thompson less favorably than similarly situated employees outside his protected groups.  *See Mandell v County of Suffolk*, 316 F.3d 368, 379 (2d Cir. 2003); *Graham v. Long Island R.R.*, 230 F.3d 34, 39–40 (2d Cir. 2000).

Where a plaintiff seeks to derive an inference of discrimination from allegations of disparate treatment, he or she must plausibly allege the existence of at least one comparator who

14

was more favorably treated despite being "similarly situated to the plaintiff in all material respects," meaning the comparator was "(1) subject to the same performance evaluation and discipline standards and (2) engaged in comparable conduct." *Ruiz v. Cnty. of Rockland*, 609 F.3d 486, 493–94 (2d Cir. 2010) (internal quotation marks omitted); *see also Bhanusali,* 2013 WL 4828657, at *7 ("Plaintiffs' general allegations that misconduct by 'younger and/or white physicians' went without peer review or discipline are wholly conclusory, do not specify the individuals involved or the nature of their alleged misconduct, and are thus insufficient to render plausible the inference of discriminatory intent.") (citations omitted).  The issue is whether the SAC has "adequately alleged that any of [Thompson's] proffered comparators is similarly situated in all material respects and that a prudent person would think [them] roughly equivalent." *Mosdos Chofetz Chaim, Inc. v. Vill. of Wesley Hills*, 815 F. Supp. 2d 679, 697 (S.D.N.Y. 2011).  "At the motion to dismiss stage . . . a court still must determine whether, based on a plaintiff's allegations in the complaint, it is plausible that a jury could ultimately determine that the comparators are similarly situated." *Id.* at 698.  "Thus, well-pled facts showing that the plaintiff has been treated differently from others similarly situated, remains an essential component of such a claim and conclusory allegations of selective treatment are insufficient to state an equal protection claim." *Id.* (citations omitted).

Here, the SAC identifies four comparators who while working at HRA were accused of sexual harassment or inappropriate conduct—two men who are not African-American, Simeon Sentino and Saul Neinstein, and two women, Theodora Berksteiner and Blondia Reynolds.  *See supra* pp. 7–10.  In assessing Thompson's claim that each is similarly situated to him, the Court considers the four in turn.

15

*Sentino*:  The SAC alleges that Sentino was the subject of "at least (2) complaints of sexual harassment and/or inappropriate conduct."  SAC ¶ 57.  And, it alleges, in contrast to HRA's treatment of Thompson, defendants "did not seek to terminate his employment, or upon information and belief, take disciplinary action against him based on the first complaint."  *Id.* The SAC, however, does not supply any basis on which to assess whether Sentino is an apt comparator for Thompson.   The SAC does not describe the behavior in which Sentino was accused of engaging, how long the alleged misconduct lasted, or whether the allegations against Sentino were corroborated or substantiated.  The spare allegations in the SAC supply no non-speculative basis to conclude that defendants treated Thompson and Sentino differently based on race.  On the basis of the SAC, one could equally, if not more plausibly, infer that the response to the allegations against Sentino derived from the different allegations against him and the differing evidence at hand.  The SAC therefore has not "adequately alleged" that Sentino "is similarly situated [to Thompson] in all material respects and that a prudent person would think [him] roughly equivalent."  *Mosdos Chofetz*, 815 F. Supp. 2d at 697.

*Neinstein*:  The SAC's allegations as to Neinstein are similarly deficient.  The SAC states that Neinstein was accused of "sexual harassment and/or engaging in appropriate conduct."  SAC ¶ 56.  It then states that defendants did not seek to terminate Neinstein's employment.  But, as with Sentino, the SAC does not allege concretely what Neinstein was accused of doing, for how long, what the evidence was of Neinstein's misconduct, or whether the allegations against him were substantiated.  On the pleadings, he, too, is not a viable comparator to Thompson.

*Berksteiner*:  The SAC's factual allegations as to Berksteiner are no more fulsome.  The SAC alleges that Berksteiner was "accused by a male of sexual harassment and/or engaging in inappropriate conduct."  *Id.* ¶ 51.  But it does not specify what Berksteiner was accused of doing,

16

how long her alleged misconduct lasted, what the evidence was of this misconduct, or whether these allegations against her were substantiated.  The SAC states that defendants notified Berksteiner of "specified date(s) as to when the incidents giving rise to the EEO complaint were alleged to have occurred" and "limited their investigation of the incidents giving rise to the complaint filed against Berksteiner, to a two (2) month period, instead of the more than two (2) year span of alleged incidents, involving Thompson."  *Id.* ¶ 52.  But the SAC does not supply a factual basis for its thesis that notifying Berksteiner of these dates reflected favorable treatment of her, as opposed to, for example, the greater specificity with which her accuser had made his allegations.  Nor does the SAC reveal how much—if any—of Berksteiner's alleged misconduct fell outside the two-month period that was investigated.

*Reynolds*:  Although slightly more specific in its statements about Reynolds, the SAC's pleadings as to her situation are still a far cry from enabling a meaningful comparison.  The SAC states that defendants did not discipline Reynolds "despite the fact that they concluded she had engaged in sexual harassment or inappropriate conduct."  *Id.* ¶ 59.  But the SAC does not allege any facts as to the misconduct in which she was alleged to have engaged or the duration of this misconduct.  It supplies no basis for assessing how that conduct compared to Thompson's conduct, which, as alleged, was determined by defendants to consist of multiple incidents of sexual harassment or other inappropriate conduct towards three women.  Arbitration Award at 3–5.  The SAC provides no non-speculative basis on which to conclude that Thompson was treated differently than Reynolds because he is a man, as opposed to, for example, because HRA's findings as to him bespoke more serious or sustained misconduct.

Finally, the SAC makes two allegations that apply to all four comparators.  First, it states that defendants did not serve any of the four by the "nail and mail" method used for Thompson.

SAC ¶ 78.  But that the nailed documents were "in open view of his neighbors, friends and family," *id.* ¶ 64, is not, without more, actionable.  Nail and mail service is a recognized and valid means of service, and Thompson does not allege that the nailing was undertaken in his case in an unusually flagrant manner.  *See Beller & Keller v. Tyler*, 120 F.3d 21, 22 (2d Cir. 1997) ("After several unsuccessful attempts to have Kindor served personally, B & K opted to serve him under New York's 'nail and mail' provision, CPLR § 308(4)  . . .  On November 2, 1994, B & K had the summons and a copy of the complaint 'nailed' to Kindor's door, and mailed him copies.").  Second, the SAC states that, in contrast to the treatment of Thompson, defendants did not charge any of the four comparators with criminal conduct, even though Thompson's "alleged conduct [ ] was in many instances less egregious than the conduct in which Reynolds, Sentino, Bersteiner [sic] or Neinstein were alleged to have engaged."  SAC ¶ 75.  But the SAC's statement that Thompson's alleged conduct "was in many instances less egregious" is vague and conclusory.  It is insufficient to show that Thompson and his proposed comparators were "similarly situated in all material respects."  *Mosdos Chofetz Chaim*, 815 F. Supp. 2d at 697.

In sum, the SAC is woefully unspecific about the four proffered comparators.  Its sparse allegations as to Sentino, Neinstein, Berksteiner and Reynolds, Berksteiner fall measurably short of that necessary to enable the Court to conclude that "a prudent person [might] think [them] roughly equivalent" to Thompson.  *Id.*;  *see Bhanusali*, 2013 WL 4828657, at *6 (holding that plaintiff doctor's disparate treatment allegations could not survive motion to dismiss when his complaint failed to allege "anything about the white physicians, such as what they may have done or how many times"); *Gillman v. Inner City Broad. Corp.*, No. 08 Civ. 8909 (LAP), 2009 WL 3003244, at *6 (S.D.N.Y. Sept. 18, 2009) (granting motion to dismiss when plaintiff who alleged age discrimination pled no "information about the reasons for [comparators'] termination

or specific employment practices by the Defendant); *cf. Yusuf v. Vassar Coll.*, 35 F.3d 709, 714

(2d Cir. 1994) (dismissing claim of discrimination under § 1981 when plaintiff "offered no

reason to suspect that his being found guilty of sexual harassment had anything to do with his

race, other than his assertion that the panel members were white and that he is Bengali");

*Stephens-Buie v. Shinseki*, No. 09 Civ. 2397, 2011 WL 2574396, at *5 (S.D.N.Y. June 27, 2011)

("mere fact" that plaintiff's race or national origin differed from those who caused her alleged

adverse employment action insufficient to raise an inference of discriminatory intent); *Johnson v.

City of N.Y.*, 669 F. Supp. 2d 444, 450 (S.D.N.Y. 2009) ("The mere fact that plaintiff and

defendants are of different races, standing alone, is simply insufficient as a factual pleading to

allege racially motivated discrimination for purposes of a plausible [S]ection 1981 claim.").

Without concrete allegations as to the nature, seriousness, and evidentiary basis for accusations

made against his comparators, the SAC's claim of disparate treatment is unacceptably

conclusory.  Because the SAC fails to state facts that would allow a court to infer he was treated

differently based on his race or gender, its claims for racial and gender discrimination must

therefore be dismissed.

### B.  Due Process Claims

The SAC also appears to raise a classic procedural due process claim, to the effect that

Thompson was deprived of his property without due process, and a so-called stigma-plus claim,

to the effect that Thompson's liberty interest in his reputation was infringed by defendants'

public posting (on his door) of the charges against him.

In analyzing procedural due process issues, the court must determine whether there is a

protected liberty or property interest and, if so, what procedures are required.  *See Mathews v.

Eldridge,* 424 U.S. 319, 335 (1976); *see also Harhay v. Town of Ellington Bd. of Educ.*, 323 F.3d

206, 212 (2d Cir. 2003).  Thompson's suspension undisputedly implicated a protected property interest.  *See O'Conner v. Pierson*, 426 F.3d 187, 197 (2d Cir. 2005) (suspending a tenured public employee without pay implicates a protected property interest).  Therefore, the analysis turns on the adequacy of the process Thompson received before and after his suspension. *Locurto v. Safir*, 264 F.3d 154, 173 (2d Cir. 2001).

Thompson claims that (1) the defendants did not inform him he faced a potential penalty beyond the administrative warning, SAC ¶ 37; (2) Grant's February 4, 2009 letter was incomplete, *id.* ¶ 39; and (3) defendants rescinded the administrative warning and sought to terminate him without giving him notice, *id.* ¶ 54.  He also alleges in general terms that defendants violated his procedural due process rights by ignoring his response to the charges during the October 2009 informal hearing and his complaints that the process was deficient and irregular.  SAC ¶¶ 41–44, 69, 79–80.

In the context of a public employee, "procedural due process is satisfied if the government provides notice and a limited opportunity to be heard prior to termination, so long as a full adversarial hearing is provided afterwards."  *LoCurto*, 264 F.3d at 171 (citing *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 545–46 (1985)).  The pre-deprivation hearing "is a minimal one" and "need not be elaborate."  *LoCurto*, 264 F.3d at 173.  The employee only needs to have "oral or written notice of the charges against him, an explanation of the employer's evidence, and an opportunity to present his side of the story."  *Loudermill*, 470 U.S. at 546; *see also O'Connor*, 426 F.3d at 198 ("Because pre-deprivation process serves a limited function, the Constitution mandates only that such process include, at a minimum, notice and the opportunity to respond.").

In this case, it is undisputed that, on February 4, 2009, Thompson was notified in writing of the complaint, the investigation and substantiation of the charges against him. *See* Feb. 4, 2009 Letter. This letter notified Thompson that he would receive an administrative warning and that the findings of the investigation would be forwarded to Legal Affairs for review. *Id.* On October 3, 2009, Thompson was also furnished, via the nail and mail service, with written notice of the specific charges against him. SAC ¶ 64. On October 23, 2009, Thompson received an informal hearing. *Id.* ¶ 79. And on December 15, 2009, he received a Step II hearing, which led to the reduction of the recommended penalty from termination to a 60-day suspension. Arbitration Award at 3.

These procedures more than meet the limited requirements for notice and opportunity to be heard before deprivation. *See O'Connor*, 426 F.3d at 198; *LoCurto*, 264 F.3d at 171. And the favorable outcome of the serial proceedings relating to Thompson impressively underscores that the procedures were fair to him. This process first enabled Thompson to defeat defendants' claim that his conduct merited termination. And, after his suspension in May 2010, Thompson obtained more process. He pursued his grievance in an adversarial arbitration proceeding before a neutral arbitrator, represented by counsel provided by his union. *See* Arbitration Award. As a result of this procedure, the arbitrator overturned Thompson's suspension and awarded him back pay and benefits. *See* Arbitration Award at 14. Thompson's classic procedural due process claim fails because, simply put, he received adequate process. *See O'Connor*, 426 F.3d at 200 (finding grievance procedure to be "an adequate post-deprivation remedy").

From this, it necessarily follows that Thompson's stigma-plus due process claim also fails. For a stigma-plus claim to succeed, an injury to reputation must be coupled with the deprivation of a protected property right *without adequate process*. *See Segal v. City of N.Y.*,

459 F.3d 207, 209 (2d Cir. 2006); *DiBlasio v. Novello*, 344 F.3d 292, 302 (2d Cir. 2003).

"Stated differently, the availability of adequate process defeats a stigma-plus claim." *Segal,* 459

F.3d at 213.  Here, as noted, Thompson received two pre-deprivation hearings and a post-

deprivation arbitration, which gave him an opportunity to be heard in a meaningful time and

manner.  That is what the Constitution dictates.  The SAC thus fails to state a due process claim.

### C.  Thompson's Claim Under the NYCHRL

Having dismissed all of Thompson's federal law claims, the Court must next determine

whether to exercise supplemental jurisdiction over his only remaining claim, which alleges racial

and gender discrimination and hostile work environment under the NYCHRL.  Federal district

courts have supplemental jurisdiction over state-law claims "that are so related to claims in the

action within such original jurisdiction that they form part of the same case or controversy under

Article III of the United States Constitution."  28 U.S.C. § 1367(a).  However, such jurisdiction

is discretionary, *see City of Chicago v. Int'l Coll. of Surgeons*, 522 U.S. 156, 173 (1997), and a

district court "may decline to exercise supplemental jurisdiction" if it "has dismissed all claims

over which it has original jurisdiction."  28 U.S.C. § 1367(c)(3).  A district court should, in

deciding whether to exercise its supplemental jurisdiction, balance the traditional "values of

judicial economy, convenience, fairness, and comity."  *Carnegie–Mellon Univ. v. Cohill*, 484

U.S. 343, 350 (1988).  Both the Second Circuit and the Supreme Court have held that, as a

general rule, "when the federal claims are dismissed the 'state claims should be dismissed as

well.'"  *In re Merrill Lynch Ltd. P'ships Litig.*, 154 F.3d 56, 61 (2d Cir. 1998) (quoting *United

Mine Workers v. Gibbs*, 383 U.S. 715, 726 (1966)).

Had the SAC's federal claims proceeded past the motion to dismiss stage into fact

discovery, there would have been some basis in judicial economy for the Court to exercise

supplemental jurisdiction over Thompson's NYCHRL claim. But Thompson's federal claims have been dismissed at the threshold. And the standards governing Thompson's federal claims differ from those under the NYCHRL: "[C]laims under the City HRL must be reviewed independently from and 'more liberally' than their federal and state counterparts," *Loeffler v. Staten Island Univ. Hosp.*, 582 F.3d 268, 278 (2d Cir. 2009). Thus, the Court's dismissal of Thompson's claims under federal law does not necessarily dictate dismissal of his claims under the NYCHRL. This case is thus one in which the Court should heed the principle that, in general, state claims ought to be dismissed when all federal claims are dismissed. *In re Merrill Lynch*, 154 F.3d at 61. The Court accordingly declines to exercise supplemental jurisdiction over the SAC's NYCHRL claim. Accordingly, that claim is dismissed without prejudice.

## CONCLUSION

For the foregoing reasons, the defendants' motion to dismiss is granted. The Clerk of Court is directed to terminate the motions at docket number 33, and to close this case.[3]

SO ORDERED.

Paul A. Engelmayer
United States District Judge

Dated:  December 9, 2013
        New York, New York

---

[3] Because it has dismissed the SAC on other grounds, the Court has no occasion to reach defendants' other arguments for dismissal, *to wit*, that the SAC fails to allege the personal involvement of Doar and Grant and that the § 1983 and NYCHRL claims are time-barred.